IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CAROLYN Y. HARRIS,                           :          Case No. 1:14-CV-01212

     Plaintiff,                           :

v.                                           :

COMMISSIONER OF SOCIAL SECURITY,             :          MEMORANDUM DECISION AND
                                                        JUDGMENT
     DEFENDANT.                           :


## I. INTRODUCTION.

In accordance with the provisions of 28 U. S. C. § 636 and FED. R. CIV. P. 73, the parties to this case have consented to have the undersigned United States Magistrate Judge conduct any and all proceedings in the case, including ordering the entry of final judgment. Plaintiff seeks judicial review of a final decision of the Commissioner denying her Title II application for a period of disability and disability insurance benefits (DIB) and her Title XVI application for supplemental insurance benefits (SSI). Pending before the Court are the parties' Briefs on the Merits (Docket Nos. 16 & 20). For the reasons set forth below, the Magistrate affirms the Commissioner's decision.

## II. CASE 1.

### A.  PROCEDURAL BACKGROUND

On July 31, 2008, Plaintiff filed applications for DIB and SSI, alleging that her disability began on April 1, 2008. The claims were denied initially on October 31, 2008 and upon reconsideration on February 20, 2009. Plaintiff made a written request for hearing on March 19, 2009 and on September 1, 2010, Plaintiff, represented by counsel, and Lynn S. Smith, a Vocational Expert, appeared and testified

at a hearing in Cleveland, Ohio before Administrative Law Judge (ALJ) Andrew M. Emerson (Docket No. 11, p. 44 of 577).

**B.    THE ADMINISTRATIVE HEARING.**

**1.    PLAINTIFF'S TESTIMONY.**

At the time of hearing, Plaintiff was 46 years of age and she weighed 220 pounds (Docket No. 11, p. 50 of 577).  Plaintiff had earned medical assistant certification (Docket No. 11, pp. 59, 60 of 577) and she had a driver's license (Docket No. 11, p. 52 of 577).

Plaintiff was married living separately from her spouse with whom she had three children, two of whom were minors.  She and her children lived in a single family ranch-style house (Docket No. 11, pp. 51-52 of 577).  She received short-term disability benefits and both Plaintiff and her children received governmental health care assistance (Docket No. 11, pp. 59-60 of 577).

During the past 15 years, Plaintiff worked at a nursing home and the Cleveland Clinic (CC). Starting as a file clerk at CC, Plaintiff advanced to patient service representative and her duties included but were not limited to making appointments, scheduling lab work and sorting and distributing mail (Docket No. 11, p. 51 of 577).  Plaintiff testified that since the onset date of disability on April 1, 2008, her ability to work has been impeded by a host of impairments and associated factors:

> First, she needed a walker to assist mobility and she was unable to stand up straight, reach overhead, push, pull, lift, walk long, bend, stoop or type (Docket No. 11, pp. 60, 61, 65 of 577). Second, Plaintiff had medically diagnosable breathing difficulties for which she was prescribed an inhaler (Docket No. 11, pp. 55, 65 of 577).  Third, Plaintiff was right-handed and her right hand was chronically numb, making grasping problematic (Docket No. 11, p. 55 of 577).  Fourth, her right wrist was unbendable requiring use of a brace (Docket No. 11, p. 56 of 577). Fifth, Plaintiff had chronic leg pain which precluded prolonged standing and required elevation to provide compression and relieve swelling (Docket No. 11, p. 63 of 577).  Sixth, Plaintiff experienced discomfort after sitting for six to seven minutes. Seventh, Plaintiff's body tensed when under stress and stress intensified her pain (Docket No. 11, p. 55, 64, 65 of 577).  Eighth, Plaintiff had mental challenges including anger outbursts, irritability, inability to concentrate, forgetfulness, a need for isolation and

difficulty getting along with others (Docket No. 11, pp. 56, 57 of 577).  Ninth, Plaintiff had sharp pain in her back, hips and knees that typically radiated throughout her body and lasted up to seven minutes per episode.  Tenth, Plaintiff had muscle spasms that lasted up to nine minutes per episode (Docket No. 11, p. 57 of 877).  Eleventh, environmental factors such as air conditioning exacerbated Plaintiff's pain.  Twelfth, while the medications–Oxycontin, Percocet, Soma and Flexeril–provided some relief, she was not pain-free.  Thirteenth, the medications had unusual and serious side effects such as nausea, pruritus and frequent urination (Docket No. 11, pp. 54, 58, 62, 64 of 577).  Fourteenth, the intensity of Plaintiff's pain was worsening (Docket No. 11, pp. 54, 57-58, 64 of 577).  Fifteenth, Plaintiff had carpal tunnel syndrome and significant shoulder pain that prevented her from reaching overhead, pushing and pulling (Docket No. 11, p. 61 of 577).  Sixteenth, Plaintiff treated regularly with a primary care physician, a gastroenterologist, an orthopedic surgeon and a counselor.  Seventeenth, Plaintiff had recently spent six days in the cardiac care unit, during which she was diagnosed with an arrhythmia and uncontrolled hypertension (Docket No. 11, pp. 66-67 of 577).

When asked what she could do, Plaintiff estimated that she could walk up to five feet before stopping, sit up to seven minutes without having to stand due to uncomfortable pressure and pain and lift up to 16 ounces (Docket No. 11, pp. 54-55 of 577).  Plaintiff performed no housework or yard work.  Her children prepared her meals and took her to the grocery store once monthly (Docket No. 11, p. 59 of 577).  Typically, Plaintiff sat in a recliner with her legs elevated, watched television and completed crossword puzzles.  Occasionally, she played a game with her children (Docket No. 11, pp. 53, 58-59 of 577).  Plaintiff had not attended church for several months because climbing stairs exacerbated her breathing problems (Docket No. 11, p. 55 of 577).

   2.    VE'S TESTIMONY.

Based on her knowledge, education, training, experience and the occupational classifications under the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a standardized occupational information publication, the VE categorized Plaintiff's past work as follows:

| Job Title DOT | Exertional Level | Skill Level | Specific Vocational Preparation |
| --- | --- | --- | --- |

| Patient Service Representative 205.362-030 | Sedentary–work which involves lifting not more than ten pounds at a time with occasional lifting or carrying articles like docket files, ledgers and small tools. | Semi-skilled–work which needs some skills but does not require doing the more complex work duties | 4–the amount of time needed to learn the techniques, acquire the information and develop the facility for average performance of this job is 3-6 months. |
| File Clerk 206.387-034 | Light-work which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. | Semi-skilled | 3--the amount of time needed to learn the techniques, acquire the information and develop the facility for average performance of this job is 30 days to three months. |

(Docket No. 11, p. 69 of 577).

The ALJ posed the *first* hypothetical:

Let's assume a hypothetical individual of the claimant's age, education and work experience who is able to perform *medium* work except that the hypothetical person could only occasionally operate foot controls, and reach overhead with the left hand and no limits with reaching with the right hand; the need to avoid concentrated exposure to temperature extremes, vibration, exposure to hazardous moving machinery and unprotected heights; the individual could only perform simple, routine and repetitive tasks in a low-stress environment with no fixed production quotas; and the individual could only occasionally interact with the public, co-workers and supervisors. Could this individual perform the claimant's past work as it was actually performed or as it was customarily performed in the national economy?

The VE responded that the hypothetical individual could perform the claimant's past work of file clerk. Furthermore, there were medium, unskilled jobs available as follows in the national and regional economies that the hypothetical individual could learn and perform after 30 days:

| JOB TITLE/DOT | NORTHEAST OHIO | STATE OF OHIO | NATIONALLY |
|---|---|---|---|
| Laundry worker/361.685-018 | 3,000 | 30,000 | 880,000 |
| Kitchen helper/318.687-010 | 2,000 | 20,000 | 490,000 |
| Patient transporter/355.677-014 | 500 | 16,000 | 360,000 |

(Docket No. 11, pp. 70-72 of 577)

The ALJ posed a *second* hypothetical question:

Assume a person of the claimant's age, education and work experience who is only able to perform *light* work, only occasionally operate foot controls, occasionally reach overhead with the left hand; they must avoid concentrated exposure to temperature extremes, vibration and hazardous moving machinery and unprotected heights; they would be only

4

able to perform simple, routine, repetitive tasks in a low-stress environment, meaning no fixed production quotas and they could only occasionally interact with the public, co-workers and supervisors. Could such individual with these limitations perform the claimant's past work as it was actually performed or as it was customarily performed in the national economy?

The VE responded that such individual could perform work as a file clerk, office helper, ticket seller and cleaner of offices. These light, unskilled jobs could be learned and performed in up to 30 days:

| JOB TITLE/DOT | NORTHWEST OHIO | STATE OF OHIO | NATIONALLY |
| --- | --- | --- | --- |
| Office helper/239.567-010 | 1,400 | 3,000 | 110,000 |
| Ticket seller/211.467-030 | 8,000 | 140,000 | 3.4 million |
| Cleaner of offices/323.687-014 | 3,000 | 30,000 | 900,000 |

(Docket No. 11, pp. 71-72 of 577).

The ALJ posed a *third* hypothetical question:

Assume a person of the claimant's age, education and work experience who is only able to perform *sedentary* work, only occasionally operate foot controls bilaterally, occasionally reach overhead with the left hand; they must avoid concentrated exposure to temperature extremes, vibration and hazardous moving machinery and unprotected heights; they would be only able to perform simple, routine, repetitive tasks in a low-stress environment, meaning no fixed production quotas and they could only occasionally interact with the public, co-workers and supervisors. Could such individual with these limitations perform the claimant's past work as it was actually performed or as it was customarily performed in the national economy?

The VE opined that the following sedentary, unskilled jobs which would take up to 30 days to learn and develop the facility for average performance, were available:

| JOB TITLE/DOT | NORTHWEST OHIO | STATE OF OHIO | NATIONALLY |
| --- | --- | --- | --- |
| Polisher/713.684-038 | 1,500 | 36,000 | 120,000 |
| Ticket taker/219.587-010 | 600 | 60,000 | 1.5 million |
| Assembler/739.687-066 | 2,500 | 25,000 | 1 million |

(Docket No. 11, pp. 72-73 of 577).

Counsel asked the VE to consider the ALJ's first hypothetical question and then add the following

5

limitations:  the hypothetical individual could use the right dominant hand in terms of fine and gross

manipulation, handling and reaching; only occasionally climbing stairs, bending and balancing, no

stooping, kneeling, crouching, crawling; no exposure to pulmonary irritants such as dust, fumes and gases

and a sit/stand option.  The VE stated that there would be no jobs to accommodate these limitations at the

sedentary or light levels of exertion (Docket No. 11, pp. 74-75 of 577).

**C.**     **THE ALJ"S DECISION.**

On September 21, 2010, ALJ Emerson rendered an unfavorable decision and made the following

findings of fact and conclusions of law:

1.     Plaintiff met the insured status requirements of the Act through December 31, 2012.

2.     Plaintiff had not engaged in substantial gainful activity since April 1, 2008, the alleged onset date.

3.     Plaintiff had the following severe impairments: obesity, degenerative disc disease (DDD), degenerative joint disease of the left shoulder, right knee, left knee and right ankle, depression and panic disorder.

4.     Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, the undersigned found that Plaintiff had the residual functional capacity (RFC) to perform sedentary work, except that she could occasionally operate foot controls bilaterally and overhead reach with her left upper extremity.  Plaintiff must avoid concentrated exposure to temperature extremes, excessive vibration and hazardous conditions such as moving machinery and unprotected heights. She was further limited to simple, repetitive, low stress (no fixed production quotas) tasks and occasional interaction with the public, co-workers and supervisors.

6.     Plaintiff was unable to perform any past relevant work.

7.     Plaintiff was born on October 25, 1963, and was age 44 years, which is defined as a younger individual, on the alleged disability onset date.  Plaintiff subsequently changed an age category to a younger individual age 45-49.

8.     Plaintiff had at least a high school education and was able to communicate in English.

6

9.     Transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules used a framework, supported a finding that Plaintiff was "not disabled" whether or not Plaintiff has transferable job skills.

10.    Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

11.    Plaintiff was not under a disability at any time from April 1, 2008, the alleged onset date through September 21, 2010 (Docket No. 11, pp. 110-124 of 577).

**D.**    **THE APPEALS COUNCIL'S DECISION**.

On March 30, 2012, the Appeals Council found no reason under the rules to review the ALJ's decision and the request for review was denied. The ALJ's decision rendered on September 21, 2010, became the final decision of the Commissioner of Social Security (Docket No. 11, pp. 192-194 of 577).

## III. CASE 2.

**A.**    **PROCEDURAL BACKGROUND**.

On October 26, 2010, Plaintiff applied for SSI, alleging that her disability began on March 15, 2008 (Docket No. 11, pp. 271-274 of 577). On October 27, 2010, Plaintiff completed an application for DIB alleging that she became unable to work due to her disabling condition on March 15, 2008 (Docket No. 11, pp. 264-270 of 577). Plaintiff's claims were denied initially on February 25, 2011 (Docket No. 11, pp. 201-204, 210-214 of 577) and upon reconsideration on July 5, 2011 (Docket No. 11, pp. 219-221, 223-225 of 577). Plaintiff requested a hearing on July 18, 2011 (Docket No. 11, pp. 233-234 of 577) and on September 20, 2012, Plaintiff, represented by counsel, and Gene Burkhammer, a VE, appeared and testified at a hearing before ALJ Traci Hixson (Docket No.11, pp. 77-109 of 577).

**B.**    **ADMINISTRATIVE HEARING.**

**1.**    **PLAINTIFF'S TESTIMONY**

Since the last hearing, Plaintiff had gained some weight and stopped driving even though she

maintained a valid driver's license.  She had not had a drink in two years and periodically, she smoked a cigarette (Docket No. 11, pp. 81, 95, 97 of 577).

Plaintiff elucidated her prior work experience at CC, explaining that she was an appointment secretary in the radiation oncology unit.  The heaviest amount of weight lifted was computer paper weighing slightly more than 10 pounds.  After getting into an altercation with her supervisor, Plaintiff went on mental health leave.  Plaintiff thought it imprudent to return to work at CC because of the ill will she harbored toward her supervisor (Docket No. 11, pp. 86-87 of 577).

Since the last hearing, Plaintiff had surgery on her left knee and toe, she had been diagnosed with carpal tunnel in her right hand, osteoarthritis in her back and knees bilaterally, a degenerated disc in her back and she used a walker to ambulate (Docket No. 11, pp. 87, 88 of 577).  The trouble in her left shoulder had subsided and her hypertension was controlled with medication (Docket No. 11, pp. 88-89 of 577).  Plaintiff used the brace for carpal tunnel and she could not lift a gallon of milk without losing feeling and control in her right hand.  Plaintiff could not reach over her head but she could write (Docket No. 11, pp. 92-93, 94 of 577).  Plaintiff could stand for five minutes before she had to sit; she could sit for up to 15 minutes; and she could neither climb nor bend (Docket No. 11, pp. 93, 94, 95 of 577).

No longer able to get opioids from several sources at the same time, Plaintiff was prescribed Percocet only for pain.  Dr. Bilifield administered a cortisone injection quarterly (Docket No. 11, pp. 91, 92, 98, 100 of 577).  Plaintiff's medication therapy now included drugs used to control heartburn, depression and auditory hallucinations (Docket No. 11, pp. 89-90 of 577).  To some extent, this therapy controlled Plaintiff's outbursts of anger which accompanied by heart palpitations, unconsciousness and defiance resulted in a panic attack.  Panic attacks were also precipitated by exposure to people.  Plaintiff opined that in addition to the medications, she benefitted from talking to a psychiatrist once a month and

8

a case manager once a week (Docket No. 11, pp. 91, 95, 101, 102 of 577).

Plaintiff admitted that she continued to be physically inactive, watching television all day. Her ability to remember was impaired and her eyes were "not that good" so she did not read. With the exception of her children, she rarely visited her family. Her daughters, now 17 and 18 years of age, prepared all of the meals, washed the dishes, laundered and shopped. Plaintiff did brush her teeth and bathe and her daughters combed her hair and "fixed" her up (Docket No. 11, pp. 82-83, 84, 95 of 577).

Unable to sleep at night even with medication, Plaintiff generally woke up in the early hours of the morning and just sat in her room watching television. She rarely came out of her room unless to see her physician or psychiatrist (Docket No. 11, pp. 84-85 of 577). However, on a good day which she had about twice monthly, Plaintiff left her room and scooted around the kitchen in a chair with casters while her children prepared meals (Docket No. 11, p. 99-100 of 577).

### 2. THE VE'S TESTIMONY.

Averring that his testimony was consistent with the DOT, the VE classified Plaintiff's vocational history over the last 15 years accordingly:

| Job title/DOT | Exertional Level | Specific Vocational Preparation |
|---|---|---|
| Appointment clerk /237.367-010 | Light-work which involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds. | 3--the amount of time needed to learn the techniques, acquire the information and develop the facility for average performance of this job is 30 days to three months. |

(Docket No. 11, pp. 103, 106 of 577).

The ALJ posed the *first* hypothetical:

Let's assume a hypothetical person of Plaintiff's age, education and employment background and this person is able to perform *sedentary* work except that the hypothetical person is occasionally operating foot controls; occasionally reaching overhead with the left upper extremity, which is the non-dominant arm; this hypothetical person should avoid concentrated exposure to temperature extremes, excessive vibration and hazardous conditions such as moving machinery and unprotected heights; the individual could only

perform simple, repetitive tasks with a few work place changes and simple work-related decisions.  And this person is having occasional interaction with the public, coworkers and supervisors.  Would this person be able to perform Plaintiff's past work?

The VE responded that the hypothetical individual could not perform Plaintiff's past work; however, there was other sedentary work in the national and regional economy that the hypothetical individual could learn and develop the facility for average performance within 30 days.  The jobs are available as follows:

| JOB TITLE/DOT | NORTHEAST OHIO | STATE OF OHIO | NATIONALLY |
|---|---|---|---|
| Addresser/209.587-010 | 300 | 3,000 | 90,000 |
| Bench assembler/706.684-042 | 800 | 9,000 | 160,000 |
| Food & Beverage clerk/209.567-014 | 500 | 16,000 | 360,000 |

(Docket No. 11, pp. 104-105 of 577).

The ALJ posed a *second* hypothetical question:

Let's add to the first hypothetical that the hypothetical individual should have no contact with the public but could interact superficially with co-workers and supervisors. Superficially meaning no lengthy discussions, no negotiations or confrontations.  Would that impact the three jobs mentioned above?

The VE responded that he would exclude the food and beverage order clerk but the bench assembler and addresser positions would not be impacted (Docket No. 11, p. 105 of 577).

The ALJ posed a *third* hypothetical:

Assume the hypothetical person is going to miss work so that at least three times per month this person is absent from work.  Would that impact the jobs mentioned?

The VE opined that based on his experience and collaboration with other professionals, missing more than two days a month on an ongoing basis would exclude all work in the economy on a competitive level (Docket No. 11, pp. 105-106 of 577).

Counsel supplemented ALJ Hixon's *second* hypothetical question with the following:

10

Assume that "the worker would require position change from sitting to standing every 15 minutes and could carry –so the lifting would still be the 10 and the 0 but could carry no more than 5 pounds." Would that have any impact on the jobs that you identified previously?

The VE opined that at the sedentary level, a person is required to lift 10 pounds occasionally so according to the DOT, the hypothetical person could still perform the addresser and the bench assembly jobs reduced by 400 jobs (Docket No. 11, pp. 106-107 of 577).

Counsel asked the VE to consider that the worker would be off task 15% of an average work day in addition to the other restrictions. The VE testified that this would exclude all work (Docket No. 11, p. 107 of 577).

**3.    THE ALJ'S DECISION**

The ALJ rendered an unfavorable decision on December 14, 2012, making the following findings of fact and conclusions of law:

1.    Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.

2.    Plaintiff had not engaged in substantial gainful activity since April 1, 2008, the alleged onset date.

3.    Plaintiff had the following severe impairments: DDD, degenerative joint disease of the left shoulder, bilateral knees and right ankle, depression and anxiety disorder.

4.    Plaintiff did not have an impairment or combination of impairments that met or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except she could only occasionally operate foot controls and overhead reach with her left upper extremity, which was the non-dominant arm. She must avoid concentrated exposure to temperature extremes, excessive vibration, and hazardous conditions such as moving machinery and unprotected heights. She was further limited to simple, repetitive tasks with few workplace changes and simple work-related decisions. She could engage in occasional interaction with the public, coworkers and supervisors.

11

6.      Plaintiff was unable to perform any past relevant work.

7.      Plaintiff was born on October 25, 1963 and was 44 years on the alleged onset date of disability.

8.      Plaintiff had at least a high school education and was able to communicate in English.

9.      Transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Plaintiff was "not disabled," whether or not the claimant had transferable job skills.

10.     Considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that the claimant could perform.

11.     Plaintiff had not been under a disability, as defined in the Social Security Act, from September 22, 2010, through the date of this decision (Docket No. 11, pp. 24-36 of 577).

**4.      APPEALS COUNCIL**

The Appeals Council found no reason under the rules to review the ALJ's decision and it denied Plaintiff's request for review.  The ALJ's decision therefore became the final decision of the Commissioner (Docket No. 11, pp. 5-7 of 577).

## IV.  MEDICAL EVIDENCE.

**A.      THE CLEVELAND CLINIC (CC).**

After four days of severe right heel pain, Plaintiff sought medical attention on January 7, 2008. Dr. Carl Miller, D.P.M., examined Plaintiff's feet, ordered X-rays and dispensed a cam boot to be worn during ambulation.  The X-ray results showed a previous resection arthroplasty at the fifth toe joint; minimal marginal osteophytes and normal appearing bones, cartilage spaces and alignment (Docket No. 11, pp. 373-376 of 577).

On January 16, 2008, Dr. Heather Henrickson, Ph.D., a clinical psychologist, conducted an individual psychotherapy evaluation for purposes of addressing depression and psychological factors affecting Plaintiff's morbid obesity.  At that time, Plaintiff was working on modifying her diet and

improving her mood.  In response, Dr. Henrickson suggested ongoing follow-up with a nutritionist, continued use of psychotropic medication management and ongoing psychotherapy.  Using the multiaxial approach adopted by the American Psychiatric Association in the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER, a manual which covers all mental health disorders and potential treatment, Dr. Henrickson opined that at that time, Plaintiff's symptoms were mild, suggesting that she had some difficulty in social, occupational or school functioning; and she was generally functioning pretty well (Docket No. 11, pp. 377-378 of 577; Www.healthgrades.com/provider/heather-henrickson).

Dr. Adele Fowler, M.D., an internal medicine specialist, addressed Plaintiff's complaints of severe back pain radiating down both buttocks and into her upper thighs on March 19, 2008.  At that time, Plaintiff was contemplating bariatric surgery and Dr. Fowler was hopeful that the surgery would help her back symptoms.  The dosage of Oxycontin, a narcotic pain reliever, was increased to help with the pain (Docket No. 11, pp. 380-381 of 577; www.healthgrades.com/physician/dr-adele-fowler).

On July 18, 2008, Dr. Fowler ordered diagnostic X-rays to determine the source of Plaintiff's complaints persistent shoulder pain and pelvic pain that materialized in her bilateral groin.  The test results revealed no abnormality in Plaintiff's hips and mild hypertrophic changes at the glenohumeral joint, a ball and socket synovial joint between the head and the humerus and the glenoid cavity of the scapula, and the acromioclavicular joint, a plane synovial joint at the top of the shoulder.  Dr. Fowler concluded that Plaintiff's pelvic pain was caused by back pain syndrome (Docket No. 11, pp. 382-385 of 577; STEDMAN'S MEDICAL DICTIONARY 463600 (West 2014); STEDMAN'S MEDICAL DICTIONARY 462930 (West 2014).

On September 17, 2008, Plaintiff was treated by Drs. Stephen P. Hayden, M. D., and Tarick Y. Doleh, both board certified specialists in internal medicine. Dr. Hayden reviewed Plaintiff's chart and conducted a physical examination.  Noting that Plaintiff had no transportation, Dr. Hayden discussed pain

13

control and expressed the importance of somehow going through the pain rehabilitation program.  In the meantime, he continued Plaintiff on Oxycontin and other medications (Docket No. 11, pp. 386, 389-390 of 577; www.healthgrades.com/physician/dr-stephen-hayden).

Dr. Doleh also reviewed Plaintiff's records and noted that she had undergone several modes of treatment for pain, including pain management, physical therapy and injections, all with only moderate relief.  Plaintiff failed to attend an orthopedic evaluation and she had displayed little interest in pursuing bariatric surgery.  Dr. Doleh refilled Plaintiff's prescriptions for pain, recommended that she apply warm moist heat for 20 minutes three times daily and encouraged her to modify her diet and exercise as tolerated (Docket No. 11, pp. 386-389 of 577; www.healthgrades.com/physician/dr-tarick-doleh).

CC's Occupational Medicine Disability Office referred Plaintiff to the chronic pain rehabilitation program (CPRP) for evaluation.  On February 4, 2009, Dr. Judith Scheman, Ph.D., reviewed Plaintiff's symptoms and history, conducted a clinical interview and administered the Depression Anxiety Stress Scale (DASS), a 42-question self report instrument that measures depression, anxiety and tension/stress and the McGill Pain Questionnaire (McGill), a self-report measure of pain.  Dr. Scheman observed no signs of psychoses or cognitive dysfunction.  However, the results from the DASS were consistent with extremely severe depression and anxiety.  The results on the McGill showed the presence of intense dimensions of pain.  Dr. Scheman recommended that Plaintiff undergo chronic pain rehabilitation on a daycare basis for up to four weeks provided she would address underlying issues considered a hindrance to her success in the program, namely, her anger, depression and anxiety (Docket No. 11, pp. 391-394 of 577; www2.psy.unsw.edu.au/groups/dass; www.ncbi.nlm.nih.gov/mcgill+pain+questionnaire).  Plaintiff went to CPRP once again on March 25, 2009 but left before being admitted (Docket No. 11, p. 399 of 577).

Plaintiff was involved in an accident while riding public transportation on April 20, 2009.  The sprain to her back and leg was treated immediately by emergency medical services (EMS).  On May 4, 2009, Plaintiff complained to Dr. Fowler that the pain persisted and she was unable to locate the muscle relaxant and pain medications given her by EMS.  Noting that Plaintiff was already taking Oxycontin and Percocet, Dr. Fowler prescribed a non-narcotic medication (Docket No. 11, pp. 402-403 of 577).

On October 21, 2009, Dr. Fowler completed the disability forms upon review of Plaintiff's medical problems, medical history and medications.  Dr. Fowler deferred a physical examination but commented that Plaintiff had done physical therapy, undergone nerve block injections and pain management, used a TENS unit and taken various medications without sufficient relief to return to work (Docket No. 11, pp. 405-407 of 577).

Plaintiff continued to complain of chronic pain in her knee joints.  The results from an X-ray examination of Plaintiff's left knee that was administered on June 2, 2010, verified the presence of degenerative arthritis underneath the kneecap (Docket No. 11, pp. 416-417 of 577).

On July 16, 2010, Jerilyn Sowell, MSN CS, conducted an outpatient prescriptions review.  Using the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER, Ms. Sowell concluded that Plaintiff had moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) (Docket No. 11, pp. 426-430 of 577).

Plaintiff underwent individual psychotherapy on July 20, 2010.  The therapy plan incorporated methods to assist Plaintiff cope with mood swings, relaxation, anger and negative feelings (Docket No. 11, pp. 423-424 of 577).

The electrocardiogram administered on March 15, 2011, showed normal sinus rhythm and possible

15

left atrial enlargement (Docket No. 11, p. 459 of 577).

Plaintiff presented to Dr. Christina M. Antenucci, M.D., a specialist in family medicine, on March 16, 2011, complaining of back pain and requesting different medications.  Dr. Antenucci noted that there were multiple providers of medications and she refused to prescribe more narcotics (Docket No. 11, pp. 450-457 of 577; www.healthgrades.com/physician/dr-christina-antenucci).

Plaintiff presented with complaints of pain in the low back,  hips and left knee on March 23, 2011. Dr. Ryan Rosen, M.D., had a strong concern that Plaintiff had been getting opioid treatment without improvement and he recommended opioid weaning (Docket No. 11, pp. 450-454 of 577).

On June 25, 2011, Plaintiff presented to the emergency department complaining of extreme left knee pain.  The lateral views of the left knee showed no fracture or dislocation but  did show degenerative changes indicative of a knee joint effusion.  Plaintiff was prescribed a non-steroidal anti-inflammatory analgesic to relieve pain (Docket No. 11, pp. 516-524 of 577).

Plaintiff consulted with Dr. Lawrence H. Bilifield, M.D., an orthopedic surgeon, for knee pain treatment and relief initially on July 7, 2011 (Docket No. 11, pp. 540-543 of 577).  Thereafter, Dr. Bilifield conducted the following notable treatment:

| | |
|---|---|
| July 20, 2012 | Administered a Depo-Medrol injection, a medication used to treat pain and swelling associated with arthritis and joint disorders (Docket No. 11, pp. 570-572 of 577; www.webmd.com/drugs/2/drug-6160/depo-medrol). |
| July 22, 2011 | Reviewed Plaintiff's magnetic resonance imaging which showed medial meniscal tear and chondritic changes (Docket No. 11, pp. 537-539, 543-544 of 577). |
| August 3, 2011 | Performed a partial medial meniscectomy, an outpatient minimally invasive surgical procedure in which all or part of a torn meniscus is surgically removed (Docket No. 11, pp. 508-515, 537-544 of 577). |
| August 5, 2011 | Ordered conservative treatment which included physical therapy after the removal of the sutures although Plaintiff was still experiencing pain (Docket No. 11, pp. 548-550 of 577). |
| August 12, 2011 | Ordered therapy for a period of three weeks to resolve Plaintiff's knee pain and discomfort (Docket No. 11, pp. 545-547 of 577). |

16

| September 2, 2011 | Performed viscosupplementation, a procedure in which hyaluronan, a highly viscous substance is injected directly into the knee joint (Docket No. 11, pp. 551-554 of 577; www.webnd.com/osteoarthritis/guide/hyaluronan). |

**B.     CONNECTIONS, A COMMUNITY BEHAVIORAL HEALTH PROVIDER.**

On June 22, 2011, Plaintiff underwent an adult diagnostic assessment.  Her presenting problems including a failed marriage, unruly children, lack of income and a change in her primary care physician. Diagnosed with episodic mood disorder, not otherwise specified (NOS), Plaintiff was accepted for counseling with the goal to assist with coping skills, handle anxiety symptoms, stress issues, anger issues and provide empathy and support (Docket No. 11, pp. 461-470, 482-491 of 577; www.neohs.org).

On February 3, 2012, Plaintiff underwent a psychiatric evaluation, during which the psychiatrist started Plaintiff on drug therapy including Prozac and Seroquel (Docket No. 11, pp. 531-536 of 577).  In the meantime, a mental health practitioner performed individual counseling and/or psychotherapy as needed:

| January 4, 2012 | Assessed Plaintiff's needs and made linkages to other social services (Docket No. 11, pp. 498-501 of 577). |
| January 11, 2012 | Developed rapport with Plaintiff and discussed the counseling process (Docket No. 11, pp. 494-495 of 577). |
| January 18, 2012 | Assisted Plaintiff overcome anxiety over pending legal matter and finding a new primary care physician (Docket No. 11, p. 496 of 577). |
| January 19, 2012 | Engaged therapeutic intervention such as supportive listening, active listening and empathy when Plaintiff discussed symptoms of depression and what made her angry (Docket No. 11, pp. 492-492 of 577). |
| February 17, 2012 | Listened with empathy to Plaintiff's expressions of anger and frustration with having to get out of bed to attend counseling (Docket No. 11, pp. 529-530 of 577). |
| March 9, 2012 | Listened with empathy to Plaintiff's complaints about new medications that caused sleepiness and impending foreclosure and homelessness (Docket No. 11, pp. 527-528 of 577). |
| April 27, 2012 | Listened with empathy to Plaintiff's description of the symptoms of depression, including the failure to take her medication, the inability to leave the house, failure to shower and suicidal ideations (Docket No. 11, pp. 525-526 of 577). |

| May 9, 2012 | Listened to Plaintiff's expressions of anger (Docket No. 11, pp. 557-558 of 577). |
| May 14, 2012 | Lectured Plaintiff about the importance of taking medications as prescribed (Docket No. 11, pp. 555-556 of 577). |
| May 18, 2012 | Listened to Plaintiff complain about the upcoming Section 8 hearing and her failure to search for housing (Docket No. 11, pp. 568-569 of 577). |
| June 11, 2012 | Listened to Plaintiff's complaints about losing her home and her lack of finances (Docket No. 11, pp. 569-570 of 577). |
| June 25, 2012 | Helped Plaintiff to decompress after the Section 8 hearing and the upcoming sale of her house in foreclosure (Docket No. 11, pp. 566-567 of 577). |
| July 5, 2012 | Listened to Plaintiff's report that she was doing well even with the recent diagnosis of tendonitis and referred Plaintiff to a surgeon for problems with her knee (Docket No. 11, pp. 564-565 of 577). |
| July 17, 2012 | Assisted Plaintiff cope with anxiety resulting from upcoming move and her lack of finances (Docket No. 11, p. 563 of 577). |
| July 19, 2012 | Listened to Plaintiff discuss the stressors of moving and obtaining Section 8 housing (Docket No. 11, pp. 562-563 of 577). |
| July 23, 2012 | Advised Plaintiff to start taking her medications to assist, in part, with resolving the auditory hallucinations (Docket No. 11, pp. 559-560 of 577). |
| August 2, 2012 | Visited Plaintiff in her home and determined that Plaintiff was feeling better after taking her medication; that her knee pain persisted although she was undergoing therapy; and that the medication had side effects (Docket No. 11, p. 561 of 577). |

**C.    CONSULTATIVE EXAMINATIONS.**

The Bureau of Disability Determination (BDD) ordered three consultative examinations with independent sources: Dr. Paul T. Scheatzle, D.O, Mr. William Mohler. M.A., and Richard C. Halas, M.A. Dr. Jera Barrett, M.D., a psychiatrist, completed a MENTAL FUNCTIONAL CAPACITY ASSESSMENT (MFCA) form provided by the Ohio Job & Family Services.

**1.    DR. SCHEATZLE, SPECIALIST IN PHYSICAL MEDICINE AND REHABILITATION.**

Dr. Scheatzle conducted a clinical interview and administered manual muscle testing on January 7, 2011.  Plaintiff complained of the worst possible pain in her right wrist, bilateral low back and both knees.  Pain medication made it better but Plaintiff averred that she could not stand, bend and stoop.  The right wrist examination was positive for Tinel's (a test used to detect an irritated nerve through a

18

percussive or tapping procedure) in  the right wrist..  Dr. Scheatzle determined that the amount of movement that Plaintiff had in the dorsolumbar spine, cervical spine, shoulders, elbows, wrists, hands/fingers, hips, knees and ankles was less than normal due to pain.  The evaluation for function and strength of individual muscles and muscle groups resulted in a finding that Plaintiff could raise her shoulders, elbows, wrists, fingers, hips, knees, feet and great toe extensors against maximal resistance. Based on the examination, Dr. Scheatzle diagnosed Plaintiff with significant mild osteoarthritis and chronic low back pain.  He further opined that given these impairments, Plaintiff could:

1.  Sit for an unlimited time provided she could change positions every 15 minutes.
2   Stand occasionally with change of position every 15 minutes.
3.  Walk occasionally up to household distances of 150 feet.
4.  Lift a maximum of 20 pounds occasionally and ten pounds frequently.
5.  Carry five pounds.
6.  Handle objects, hear, speak, travel, understand, remember, concentrate and persist within normal limitations.
7.  Engage in social interaction and adaptation in a diminished capacity because of an anxious mood (Docket No. 11, pp. 434-437, 438-439 of 577; www.healthgrades.com/physician/dr-paul-scheatzle; www.webmd.com/pain-management/carpal-tunnel-syndrome).

## 2.  MR. MOHLER, PSYCHOLOGIST.

On February 16, 2011, Mr. Mohler conducted an interview without administering any diagnostic tests.  It was his impression that Plaintiff functioned in the borderline to low normal range of intellectual abilities; that she had a somewhat shortened attention span and concentration was problematic; that persistence was poor; that her insight and judgment were mildly impaired; and she had fairly marked social isolation.  Compartmentalizing Plaintiff's mental impairment using the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDER, Mr. Mohler concluded that Plaintiff had moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) (Docket No. 11, pp. 440-444 of 577; www.healthscores.com/provider).

19

3.    MR. HALAS, CLINICAL PSYCHOLOGIST

On June 23, 2011, Mr. Halas conducted a clinical interview and mental status examination to determine the current levels of adjustment and mental status used to facilitate long-term disability determination.  During the clinical interview, Mr. Halas made the following observations:

1.    Plaintiff showed relatively high levels of anxiety.
2    .Plaintiff's psychomotor activity fluctuated between periods of agitation and retardation.

3.    Plaintiff was not hallucinatory or delusional; reality contact seemed adequate.
4.    Plaintiff's overall quality of consciousness was good.
5.    Plaintiff understood the ramifications and the need for the evaluation.
6.    Plaintiff watched television most of the day.
7.    Plaintiff had no friends yet her neighbor drove her to the appointment.
8.    Plaintiff was adequately nourished, being 250 pounds and 5' tall.
9.    Plaintiff admitted to feelings of hopelessness, helplessness and worthlessness but she was not suicidal.
10.   Plaintiff had feelings of guilt around her husband's abandonment.
11.   Plaintiff's insight and judgment were assessed as poor.

(Docket No. 11, pp. 472-475 of 577).

Mr. Halas used the DSM to summarize Plaintiff's mental health disorders and its affect on her personal well-being:

| AXIS | WHAT IT MEASURES | MR. HALAS' OPINION |
|---|---|---|
| I.<br>Clinical symptoms. | This is what is typically thought of as the diagnosis (e.g., depression, schizophrenia, social phobia). | Major depression, recurrent type<br>Generalized anxiety disorder |
| II.<br>Personality Disorders and Intellectual Disabilities. | Axis II assesses personality disorders and intellectual disabilities. These disorders are usually lifelong problems that first arise in childhood, are accompanied by considerable social stigma because they are suffered by people who often fail to adapt well to society, and these disorders can seem untreatable and difficult to pinpoint. | No diagnosis. |
| III.<br>Physical conditions that play a role in the development, continuance or exacerbation of Axis I and II disorders. | Physical conditions such as brain injury or HIV/AIDS that can result in symptoms of mental illness are included here. | Deferred for medication examination. |

| IV.<br>Severity of psychosocial stressors. | Events in a person's life, such as death of a loved one, starting a new job, college, unemployment, and even marriage can impact the disorders listed in Axis I and II. These events are both listed and rated for this axis. | Psychosocial stressors such as unemployment, financial concerns, health concerns, dependency upon boyfriend, and the death of husband. |
|---|---|---|
| V.<br>Highest level of functioning. | The clinician rates the person's level of functioning both at the present time and the highest level within the previous year.  This helps the clinician understand how the above four axes are affecting the person and what type of changes could be expected. | Serious symptoms (ex: suicidal ideation, severe obsessive rituals) OR any serious impairment in social, occupational, or school functioning (ex: no friends, unable to hold a job). |

Mr. Halas concluded that Plaintiff would not appear to have significant deficits in understanding, remembering and carrying out instructions or in maintaining attention and concentration and maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.  Plaintiff appeared to have significant deficits in responding appropriately to supervision and to co-workers in a work setting and responding appropriately to work pressures in a work setting (Docket No. 11, pp. 475-476 of 577).

## 4. DR. BARRETT.

On September 14, 2012, Dr. Barrett completed the MFCA and opined that Plaintiff had marked limitations in the following abilities to:

1. Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
2. Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Docket No. 11, pp. 575-576 of 577).

On the same date, Dr. Barrett completed a form for the Cuyahoga County Department of Job and Family Services, in which she placed Plaintiff's onset date at 2012 and she recommended that at the onset of Plaintiff's impairment was 2012 and that Plaintiff could participate in vocational rehabilitation and skills training (Docket No. 11, p. 577 of 577).

## V. THE DISABILITY REQUIREMENT AND THE SEQUENTIAL EVALUATION.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920)). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)).

Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)).

Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)).

Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she

22

can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6ᵗʰ Cir.2002)).

If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.* If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

## VI. STANDARD OF REVIEW.

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (1994). Judicial review of the Commissioner's decisions proceeds along two lines: whether the Commissioner employed the correct legal standards and whether the ALJ's findings are supported by substantial evidence. *Id.* (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6ᵗʰ Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id.* (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6ᵗʰ Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6ᵗʰ Cir. 1984)).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6ᵗʰ Cir.2007). Rather, the reviewing court must examine the administrative record as a whole and if the Commissioner's decision

23

is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## VII. ANALYSIS

Plaintiff presents four reasons that the ALJ's decision finding her not disabled is neither based on correct legal principles nor supported by substantial evidence:

1. The ALJ erred in adopting the prior RFC assessment.
2. The ALJ failed to appropriately analyze Dr. Scheatzle's findings.
3. The ALJ erred in failing to treat Dr. Barrett as a treating source.
4. The ALJ erred in conducting a pain analysis.

Defendant responded that:

1. Although the ALJ gave some weight to the opinions of Drs. Scheatzle and Barrett, she explained why she could not accept the extreme and contradictory aspects of these two opinions.
2. The ALJ fully considered the impact of Plaintiff's pain.

## 1. ADOPTION OF ALJ EMERSON'S RFC.

Plaintiff has not challenged the merits of ALJ Emerson's decision on RFC, but, instead argues that ALJ Hixon erred in adopting ALJ Emerson's RFC and evaluating the current evidence in regard to Plaintiff's RFC.

### A. STANDARD OF REVIEW.

In *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 839 (6th Cir.1997), the Sixth Circuit determined that 42 U.S.C. § 405(h) requires finality in Social Security decisions, holding that where the first ALJ to review a claim for benefits by the plaintiff had determined that her residual functioning capacity was for "sedentary" work, a second ALJ's subsequent finding that she could perform

24

"medium" work was precluded. The *Drummond* Court rejected the Commissioner's contention that the Social Security Administration has unfettered discretion to reexamine issues previously determined absent new and additional evidence. *Id*. at 842. Also in the *Drummond* case, the Sixth Circuit held that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id*. at 839.

The Social Security Administration succinctly explained how it applies the *Drummond* holding in Acquiescence Ruling 98-4(6), DRUMMOND V. COMMISSIONER OF SOCIAL SECURITY, 126 F.3d 837 (6th Cir. 1997) -- EFFECT OF PRIOR FINDINGS ON ADJUDICATION OF A SUBSEQUENT DISABILITY CLAIM ARISING UNDER THE SAME TITLE OF THE SOCIAL SECURITY ACT -- TITLES II AND XVI OF THE SOCIAL SECURITY ACT, as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

**B.     THE RESOLUTION**.

Here, the Appeals Council did not grant review of ALJ Emerson's September 21, 2010-decision and Plaintiff failed to file a request for judicial review within the 60-day period. In administrative law parlance, ALJ Emerson's decision stands as the final decision of the Commissioner of Social Security prior to September 21, 2010. The subsequent claim that was adjudicated by ALJ Hixon is not the same claim that was adjudicated by ALJ Emerson. ALJ Hixon's review is appropriately limited to Plaintiff's claim arising after September 22, 2010.

The Magistrate concludes that Plaintiff's position in this regard is unsupportable. The *Drummond res judicata* rule applies here and it supports the ALJ Hixon's adoption of the ALJ Emerson's RFC

findings for the period preceding September 21, 2010.

**2.**   **DEFERENCE GIVEN STATE AGENCY PHYSICIAN OPINIONS.**

Plaintiff argues that Dr. Scheatzle's objective, supportive findings establish a severe impairment to Plaintiff's dominant, right upper extremity which causes more than a minimal impact on her functioning.  Although ALJ Hixon gave "some" weight to Dr. Scheatzle's opinions, Plaintiff suggests that she erred in failing to analyze Dr. Scheatzle's opinions consistent with the controlling-weight standards established in *Gayheart v. Commissioner*, 710 F.3d 365,179 (6th Cir. 2013).

**A.**   **THE STANDARD OF REVIEW FOR STATE AGENCY PHYSICIANS.**

State agency medical consultants are highly qualified specialists who are also experts in Social Security disability evaluation.  20 C.F.R. §§ 404.1512(b)(8), 416.1512(b)(8) (West 2014).  ALJs are not bound by any findings made by State agency medical consultants; however, the ALJ *must* consider findings and other opinions of State agency medical and psychological consultants as opinion evidence, except for the ultimate determination about whether the claimant is disabled.   20 C.F.R. §§ 404.1512(b)(8), 416.1512(b)(8) (West 2014).

The rules for evaluating opinion evidence found in 20 C.F.R. §§ 404.1527(f), 416.927(f) require ALJs to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of non-examining physicians and psychologists.   TITLES II & XVI:   CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MED. & PSYCHOLOGICAL CONSULTANTS & OTHER PROGRAM PHYSICIANS & PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE & APPEALS COUNCIL, SSR 96-6p (July 2, 1996).  The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.  *Id.*  For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed

26

by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources. *Id.*

For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the ALJ and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. *Id.* The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant. *Id.*

### B. CONSULTATIVE EXAMINATION UNDER *GAYHEART*.

Plaintiff argues that although he is a consultative examiner, Dr. Scheatzle's opinions deserve review under *Gayheart*, *supra*. The ALJ in *Gayheart* attributed little weight to the opinions from Dr. Onady, a treating source, and instead, relied on the medical opinions of Drs. Buban and Flexman, both consultative examining physicians. *Id.* at 377. In his analysis, the ALJ gave rigorous scrutiny in determining that Dr. Onady's opinions were entitled to little weight and failed to apply the same level of scrutiny–supportability, consistency, specialization-- to the opinions of the consultative doctors on whose findings he relied. *Id.* at 379. The ALJ provided a modicum of reasoning that was relevant to how Dr. Onady's opinions should be weighed after determining that they were not controlling. *Id.* His failure to apply the same level of scrutiny to the opinions of the consultative doctors on which he relied, let alone the greater scrutiny of such sources called for by 20 C.F.R. § 404.1527, called into question the ALJ's

analysis for failure to abide by the Commissioner's regulations.  The Court suggested that a more balanced analysis might allow the Commissioner to ultimately defer more to the opinions of the consultative doctors than those of treating physicians.  *Id.*

The Magistrate finds the instant case distinguishable from *Gayheart* because ALJ Hixon did not scrutinize Dr. Scheatzle's opinions or attribute more weight to his opinions than to those of the treating physicians.  ALJ Hixon evaluated Dr. Scheatzle's opinions under 20 C.F.R. §§ 404.1527, 416.927 finding that he had a speciality in osteopathic medicine and that he performed a one-time consultative examination on January 7, 2011.  Dr. Scheatzle provided a glimpse into Plaintiff's muscle strength and its affect on her ability to function, making a passing reference to Plaintiff's irritated nerves responding to the Tinel's test and not ruling out osteoarthritis as a source of Plaintiff's wrist pain (Docket No. 12, pp. 27, 32 of 577).

The Magistrate finds that ALJ Hixon evaluated Dr. Scheatzle's opinions consistent with the rules for evaluating opinion evidence under 20 C.F.R. §§ 404.1527(f), 416.927(f) and provided specific and legitimate reasons for giving Dr. Scheatzle's opinions some weight.  The *Gayheart* standards under which Plaintiff seeks remand to the Commissioner are not applicable in this instance.

## C.   THE HYPOTHETICAL QUESTIONS.

Plaintiff has not framed particular clinical findings that should have been included in the hypothetical question; rather, she suggests that any responses of the VE that fail to include Dr. Scheatzle's clinical findings cannot form the basis of a substantial evidence determination.

### 1.   STANDARD OF REVIEW.

It is well established that in order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments.  *Ealy v. Commissioner*

*of Social Security*, 594 F.3d 504, 516 (6th Cir.2010) (*See Howard v. Commissioner of Social Security*, 276

F.3d 235, 239, 241 (6th Cir.2002); *see also Webb v. Commissioner of Social Security*, 368 F.3d 629, 633

(6th Cir.2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should

provide the VE with ALJ's assessment of what the claimant "can and cannot do.")).

     2.    RESOLUTION.

The Magistrate finds Plaintiff's argument unavailing. In this case, the testimony of the VE

included, and centered upon, one or more hypothetical questions posed by ALJ Hixon that asked whether,

given certain assumptions about physical capability, Plaintiff could perform certain types of jobs, and the

extent to which such jobs exist in the national economy. ALJ Hixon reasonably incorporated what she

considered credibly established limitations. Since there were no diagnostic manifestations showing carpal

tunnel syndrome to be a medically determinable impairment, ALJ Hixon did not err in failing to

incorporate limitations she found not to exist.

Notably, the transcript of the proceedings reveals that when presented with the opportunity to

cross-examine the VE or pose revised hypothetical questions, counsel asked that the VE consider Dr.

Scheatzle's findings that Plaintiff could sit for an unlimited time and she must change positions every 15

minutes; stand occasionally with change of position every 15 minutes; walk short distances; lift a

maximum of 20 pounds occasionally and ten pounds frequently; carry five pounds; and engage in social

interaction and adaptation in a diminished capacity because of an anxious mood. The VE explicitly found

that even with these limitations, the hypothetical person could still perform jobs which had been proffered

in response to the hypothetical question incorporating medically determinable impairments already

recognized by ALJ Hixon.

The Magistrate is not persuaded that the failure to incorporate disabilities suggested by Dr.

Scheatzle in the hypothetical question posed to the VE, produced reversible error particularly since Plaintiff was given an opportunity to cure any defect on cross-examination.

####    D.    THE RFC.

Plaintiff argues that ALJ Hixon compounded the error by proceeding to evaluate her RFC without appropriately accounting for Dr. Scheatzle's functional limitations.

####    1.    STANDARD OF REVIEW.

Residual functional capacity is defined as the most a claimant can still do despite the physical and mental limitations resulting from her impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a) (West 2015). The responsibility for determining a claimant's RFC rests with the ALJ, not a physician.  20 C.F.R. §§ 404.1546(d), 416.946(c) (West 2015).  An ALJ may not substitute his or her opinion for that of a physician, yet the ALJ is not required to recite the medical opinion of a physician verbatim in his or her residual functional capacity finding.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) (West 2015).

There are limited occasions when the medical evidence is so clear, and so undisputed, that an ALJ would be justified in drawing RFC conclusions from such evidence without the assistance of a medical source.  *Mitsoff v. Commissioner of Social Security*, 940 F.Supp.2d 693, 703 (S.D.Ohio 2013) (*See Deskin v. Commissioner of Social Security*, 605 F.Supp.2d 908, 912 (N.D.Ohio 2008) ("To be sure, where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment").  The ALJ reserves the right to decide certain issues, such as a claimant's RFC.  20 C.F.R. § 404.1527(d) (West 2015).  Nevertheless, courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against relying on their own expertise in drawing RFC conclusions from raw medical data. *Fensterer v. Commissioner of Social Security,* 2013 WL 4029049, *10 (E.D.Mich. 2013) (*See Isaacs*

30

*v. Astrue*, 2009 WL 3672060, at * 10 (S.D.Ohio 2009) ("The RFC opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[I]n making the RFC finding, the ALJ may not interpret raw medical data in functional terms.' "), *quoting Deskin, supra*, 605 F.Supp.2d at 912; *see also Nguyen v. Chater,* 172 F.3d 31, 35 (1ˢᵗ Cir.1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985) ("By independently reviewing and interpreting the laboratory reports, the ALJ impermissibly substituted his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence.")).

### 2. THE RESOLUTION.

The ALJ accurately portrayed the record and more importantly, made a RFC assessment which included a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence.  The problem in this case is that the medical opinions regarding Plaintiff's functional limitations are limited to September 22, 2010 through December 14, 2012.  During this time, Plaintiff was not suffering some complex diagnoses; rather, she was undergoing counseling at Connections and her physical impairments were primarily focused on recovery after surgery to repair a torn meniscus.  The medical evidence for this time period showed relatively little physical impairment and none of Plaintiff's treating physicians rendered an opinion about Plaintiff's functional capacity or suggested that a functional capacity evaluation was required.  Dr. Scheatzle offered an opinion on February 7, 2011, that Plaintiff had the specific RFC for light work.  ALJ Hixon did not make her own independent medical findings; rather, she drew conclusions from Dr. Scheatzle's opinions and used her commonsense judgment to discount such opinions which were internally inconsistent.

31

The medical evidence is so clear and so undisputed for the relevant period of time, that the ALJ was justified in drawing such functional capacity inferences from the evidence.  Plaintiff's contention that the ALJ erred in evaluating her RFC without appropriately accounting for Dr. Scheatzle's functional limitations is unsupported by the record.

**3.     TREATING SOURCE OPINIONS.**

Plaintiff argues that ALJ Hixon erred in failing to attribute controlling weight to the opinions of Dr. Barrett, a treating psychiatrist at Connections, or give good reasons for assigning weight other than controlling to Dr. Barrett's opinions.

**A.     THE STANDARD OF REVIEW.**

Not all treating health care providers are "treating sources" under the applicable Social Security Regulations.  A "treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [claimant]."  20 C.F.R. §§ 404.1502,416.902 (West 2015).  A physician is a "treating source" if he or she has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant  . . . with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation [that is] typical for the [treated condition(s)].  *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 407 (6th Cir. 2009) (*citing* 20 C.F.R. § 404.1502).

Generally, treating source opinions must be given "controlling weight" if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques; and the opinion is not inconsistent with the other substantial record evidence.  *Id.* at 375-376 (*citing* 20 C.F.R. § 404.1527(c)(2)).  If the Commissioner does not give a treating-source opinion controlling weight, then the

opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Id.* at 376 (*citing* § 404.1527(c)(2)-(6)). The Commissioner must provide "good reasons" for discounting the weight given to a treating-source opinion, *Id.* (*citing* § 404.1527(c)(2), and such reasons must be supported by the evidence in the case record and sufficiently specific to make clear what weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Id.* (*citing* SSR 96–2p, POLICY INTERPRETATION RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *5 ( July 2, 1996)).

### B.  THE RESOLUTION.

The medical records do not support a finding that Dr. Barrett was Plaintiff's treating psychiatrist who provided Plaintiff with medical treatment on an ongoing basis.  By definition then, Dr. Barrett was not a treating physician.  ALJ Hixon appropriately considered Dr. Barrett a medical source and examined her single report under the regulations set forth in 20 C.F.R. §§ 404.1527, 416.927, for evaluating opinion evidence.  Dr. Barrett's opinions were not entitled to controlling weight and the ALJ did not commit reversible error by failing to accord controlling weight to Dr. Barrett's opinions.

### 4.  PAIN ANALYSIS.

Plaintiff argues that the ALJ's decision fails to take into account her complaints of pain using Social Security Ruling (SSR) 88-13, TITLES II AND XVI: EVALUATION OF PAIN AND OTHER SYMPTOMS, 1988 WL 236011 (July 20, 1988).

### A.  STANDARD OF REVIEW.

SSR 88-13p addresses the subjective nature of pain and the inability to measure it by reliable techniques.  *Id.*  Pain cannot be found to have a significant effect on a disability determination or decision

33

unless medical signs or laboratory findings show that a medically determinable physical or mental impairment is present that could reasonably be expected to produce the pain alleged. *Id.* Thus, when the claimant indicates that pain is a significant factor of his/her alleged inability to work, and the allegation is not supported by objective medical evidence in the file, the adjudicator shall obtain detailed descriptions of daily activities by directing specific inquiries about the pain and its effects to the claimant, his/her physicians from whom medical evidence is being requested, and other third parties who would be likely to have such knowledge. *Id.*

In developing evidence of pain or other symptoms, it is essential to investigate all avenues presented that relate to subjective complaints, including the claimant's prior work record and information and observations by treating and examining physicians and third parties, regarding such matters as:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions; and
6. The claimant's daily activities.

In evaluating a claimant's subjective complaints of pain, the adjudicator must give full consideration to all of the available evidence, medical and other, that reflects on the impairment and any attendant limitations of function. *Id.* The RFC assessment must describe the relationship between the medically determinable impairment and the conclusions of RFC which have been derived from the evidence, and must include a discussion of why reported daily activity restrictions are or are not reasonably consistent with the medical evidence. *Id.* In instances in which the adjudicator has observed the individual, the adjudicator is not free to accept or reject that individual's subjective complaints solely on the basis of such personal observations. *Id.* Rather, in all cases in which pain is alleged, the determination or decision rationale is to contain a thorough discussion and analysis of the objective

34

medical evidence and the non-medical evidence, including the individual's subjective complaints and the adjudicator's personal observations.

###    B.    RESOLUTION

It is true that ALJ Hixon did not explicitly state that her analysis was made pursuant to SSR 88-13p; however, she investigated all avenues that related to subjective complaints and determined that pain was a significant factor in Plaintiff's alleged inability to work.  Specifically, ALJ Hixon found that Plaintiff had DDD and joint disease, both impairments shown by medically acceptable clinical and laboratory diagnostic techniques that could reasonably be expected to produce Plaintiff's pain.  In evaluating the intensity, persistence, and limiting effects of Plaintiff's pain, ALJ Hixon considered that Plaintiff had chronic pain over a significant period of time; that she used a rolling cane to ambulate for over a year; that she had undergone a series of injections for pain and that she otherwise used opioids as a means of providing day-to-day pain relief.

When considering the credibility of Plaintiff's statements about her symptoms, ALJ Hixon factored in statements and other information provided by treating and examining physicians about the symptoms and how they affected Plaintiff's ability to function.  ALJ Hixon did not find any specific incredible statements as part of Plaintiff's hearing testimony; rather, she identified a number of behaviors in the decision that built a bridge between the evidence and the conclusion that Plaintiff's testimony was only partially credible.  ALJ Hixon noted that Plaintiff's symptoms tended to fluctuate in frequency and severity over a period of months; that Plaintiff gave conflicting stories about her alcohol and drug use to different physicians; that Plaintiff was opioid-dependent and she strategically used several sources to obtain prescriptions simultaneously; that she did not participate in rehabilitation therapy when recommended; that the record did not show that the cane and walker were prescribed; that the State agency

35

psychologist found only mild limitations in activities of daily living; and that Plaintiff's pain was not so intense as to cause consideration of bariatric surgery, which would provide not only the obvious benefits but assist in back pain relief (Docket No. 11, pp. 30, 31, 32, 34 of 577).

In conclusion, ALJ Hixon listed many of the specific factual assertions, followed by qualifying statements designed to indicate that she considered Plaintiff's complaints of pain partially credible and to what extent she believed Plaintiff's testimony was contradicted or limited by other evidence in the record. ALJ Hixon's arrangement of the decision should not detract from the fact that she fully considered Plaintiff's pain and its affect on her ability to work and that such conclusions are grounded in the evidence and articulated consistent with the requirements of the regulations.  Since the ALJ complied with the regulations and her decision is supported by substantial evidence, the Magistrate affirms such decision.

### VIII.  CONCLUSION.

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   February 23, 2015

36